IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ALICE MITWARUCIU, | |
| Plaintiff, | **4:21CV3147** |
| vs. | |
| STATE OF NEBRASKA | **MEMORANDUM AND ORDER** |
| Defendants. | |

This matter is before the Court on Defendant's Motion for Summary Judgment. (Filing No. 62.) For the reasons set forth below, the motion will be granted.

## PROCEDURAL BACKGROUND

Plaintiff sued the State of Nebraska, Scott Frakes (former Director of the Nebraska Department of Correctional Services ("NDCS")), Dr. Harbans Deol (Medical Director of NDCS), and Dawn-Renee Smith (Deputy Director of Programs for NDCS), alleging she was demoted because of her race, national origin, and color and due to her engagement in protected activities. (Filing No. 1.) Her Complaint asserted claims under the Nebraska Fair Employment Practices Act ("NFEPA"), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981 and § 1983 under the First Amendment. (Filing No. 1.)

On July 29, 2022, the Court dismissed Plaintiff's First Amendment claims against the individual defendants based on qualified immunity. (Filing No. 31.) The Court also dismissed Plaintiff's First Amendment claims against the State of Nebraska. (Filing No. 31.) Therefore, the only claims remaining in this action are those against the State (referred to herein as "Defendant") for alleged violations of Title VII and the NFEPA.

## STATEMENT OF FACTS

### 1. Plaintiff's Employment with NDCS

Plaintiff was hired by NDCS in 2014 as a clinical psychologist. (Filing No. 1-1.) Plaintiff's "race and color is Black, and her national origin is Kenyan." (Filing No. 1-1.) In 2016, Plaintiff was named the Behavioral Health Administrator ("BHA"). (Filing No. 63-9.) The BHA position had both a treatment provider component and operational management responsibilities. (Filing No. 74-3.) As BHA, Plaintiff was the lead administrator of all NDCS behavioral health services, including its mental health, substance abuse, sex offender, and social work services. (Filing No. 1-1; Filing No. 63-8; Filing No. 63-3.) In that role, Plaintiff was stationed at NDCS' Central Office and supervised by Dr. Deol from 2017-2019. (Filing No. 24; Filing No. 29; Filing No. 74-3.) Dr. Deol reported to Director Frakes, who was the Director of NDCS at the time. (Filing No. 74-3.) Dr. Deol was born in India to parents of East Indian ethnicity. (Filing No. 74-3.) Dr. Deol considers his ethnicity to be African Indian. (Filing No. 74-3.)

Plaintiff received positive performance reviews during her tenure as BHA. Plaintiff's 2017 job evaluation reflected that Plaintiff exceeded expectations in seven categories and met expectations in five categories. (Filing No. 74-2.) Plaintiff's 2018 evaluation was also exceptional. (Filing No. 74-3; Filing No. 74-6.) Prior to July 2019, Director Frakes never issued Plaintiff any disciplinary action, nor had he directed Dr. Deol to issue her disciplinary action. (Filing No. 74-5.) Likewise, Dr. Deol never issued Plaintiff progressive discipline, never issued her any written disciplinary action, never placed her on probation, and never suspended her. (Filing No. 74-3.)

During Plaintiff's time as BHA, each service within NDCS had a Behavioral Health Assistant Administrator ("BHAA") who was supervised by, and reported to, Plaintiff. (Filing No. 1-1; Filing No. 64; Filing No. 63-13; Filing No. 63-10.) The BHAA's included: Dr. Rick Thomas (substance abuse services); Dr. Johnna Williams (mental health services); and Dr. Jeff Melvin (sex offender services). (Filing No. 1-1; Filing No. 64; Filing No. 63-13; Filing No. 63-10.) Dr. Thomas, Dr. Melvin, and Dr. Williams are Caucasian. (Filing No. 63-9.)

### 2. ACLU Lawsuit

On October 17, 2018, the American Civil Liberties Union ("ACLU") filed a civil rights lawsuit in federal court against NDCS on behalf of eleven inmates. (Filing No. 63-21.) The lawsuit alleged deficiencies in NDCS' behavioral health services. (Filing No. 63-21.) On March 14, 2019, the Nebraska Attorney General's Office and NDCS Legal Services requested that Plaintiff provide information and documents sought by Dr. Dean Aufderheide—the expert witness retained by NCDS in the civil rights litigation. (Filing No. 63-5; Filing No. 63-8.) Plaintiff had difficulty providing the information in the requested timeframe. (Filing No. 63-8; Filing No. 63-5.) Plaintiff produced information on May 30, 2019, but it needed to be submitted in a different format. (Filing No. 63-5; Filing No. 63-8.) Dr. Deol provided the supplemental responses. (Filing No. 63-8.) Plaintiff stated it was extremely difficult and time consuming to retrieve the requested information and numerous requests for supplemental information was received. (Filing No. 74-1.) Plaintiff asserted that the system used to maintain inmate records did not have the capability to run meaningful data, and that much of the requested information had to be compiled by hand. (Filing No. 74-1.)

Dr. Aufderheide issued his expert report on May 13, 2019. (Filing No. 63-3.) Dr. Aufderheide opined that a "structural re-organization of the behavioral health delivery system and development of a quality assurance program and management information system [would] ensure more efficient and effective delivery and oversight of mental health treatment and services in the NDCS." (Filing No. 63-3.) On May 31, 2019, Nebraska Assistant Attorney General Danielle Rowley sent an email to Agency Legal Counsel Candance Bottorf, copying Administrative Assistant Betty Jo Williams, requesting that Ms. Bottorf meet with Dr. Aufderheide. (Filing No. 63-3; Filing No. 63-5.) The email explained that Dr. Aufderheide had opined that behavioral health services needed a "complete overhaul."[1] (Filing No. 63-3.) The email noted that the information Plaintiff provided to Dr. Aufderheide may not have been factual and that Dr. Aufdenheide was "very leery" of Plaintiff. (Filing No. 63-3.)

---

[1]At the time he was trying to restructure the BHA position, Dr. Deol was not aware that Dr. Auferheide had recommended reorganizing behavioral health services. (Filing No. 74-7.)

### 3. Plaintiff's Reassignment

In early 2019, Dr. Deol and Director Frakes discussed restructuring the behavioral health services team, including reassigning Plaintiff to a different position. (Filing No. 63-12.) Dr. Deol started the process of reorganizing behavioral health in the "broader sense" in 2017 to include not only behavioral health, but also medical and psychiatric care. (Filing No. 63-12.) He stated that the piece of reorganization that developed in 2019 was the behavioral health/mental health side. (Filing No. 63-12.) Dr. Deol believed reorganization was needed to provide complete, comprehensive care to inmates. (Filing No. 74-3.)

In mid-June 2019, Plaintiff was reassigned to a BHAA position. (Filing No. 24; Filing No. 29; Filing No. 74-1.) Dr. Thomas retired in July 2019 and Dr. Williams was assigned to replace him. (Filing No. 63-8.) Plaintiff was assigned to replace Dr. Williams. (Filing No. 63-8.) Dr. Melvin became the BHAA for sex offender services. (Filing No. 63-8.) In her new position as a BHAA, Plaintiff was no longer in charge of administering all of NDCS' behavioral health services, but instead, was only responsible for administering mental health services. (Filing No. 24; Filing No. 29.) Plaintiff had fewer job duties as BHAA. (Filing No. 74-1.) Plaintiff no longer supervised the other BHAAs—she became their peer. (Filing No. 74-6.)

When Plaintiff moved to her new position, her salary was reduced by $5,000 per year. (Filing No. 74-13.) The initial plan was to reduce Plaintiff's salary by $10,000 annually, but after Plaintiff complained to Dr. Deol, he spoke to Director Frakes, who ultimately decided on a smaller reduction of $5,000 per year. (Filing No. 63-12; Filing No. 63-14; Filing No. 63-3; Filing No. 74-3.) During the restructure process, Dr. Williams was given a pay raise. (Filing No. 74-3.) Dr. Williams' salary increased by over $10,000. (Filing No. 63-9.) Following the reassignment, Plaintiff still made approximately $10,000 more than Dr. Williams and $20,000 more than Dr. Melvin. (Filing No. 63-9.)

### 4. Plaintiff's Reporting Activities

On several occasions throughout the fall of 2018 and into early 2019, Plaintiff reported to Dr. Deol and Director Frakes that Department of Corrections Deputy Director Dawn-Renee Smith was making clinical decisions concerning inmates without proper licensure. (Filing No. 1-1.) Deputy Director Smith was aware of Plaintiff's complaints. (Filing No. 74-4.) In early 2019,

4

Plaintiff also reported to Dr. Deol that Lincoln Correctional Center ("LCC") staff were not properly administering medications to inmates.  (Filing No. 63-12; Filing No. 74-1.) Then, in May 2019, Plaintiff reported to Director Frakes that she was being discriminated against by Dr. Deol and suffering from retaliatory treatment by Dr. Deol and Deputy Director Smith.  (Filing No. 74-4; Filing No. 74-6; Filing No. 74-10.)

### 5.  Plaintiff's Resignation

Plaintiff submitted her resignation from NDCS on or about August 20, 2019, with an effective date of September 9, 2019.  (Filing No. 63-4.)  Dr. Deol submitted a formal request to create a BHA position on November 14, 2019—approximately two months after Plaintiff resigned. (Filing No. 63-9.)  The BHA position was modified to be an operational position, with treatment responsibilities removed from the position.  (Filing No. 63-13.) Ms. Sarah Fischer, a Caucasian, was hired as BHA on February 24, 2020.  (Filing No. 74-8.) Ms. Fischer holds a master's degree in public administration, with an emphasis in non-profit management.  (Filing No. 74-8.)

Following her resignation, Plaintiff filed a charge with the Nebraska Equal Opportunity Commission ("NEOC") alleging employment discrimination.  (Filing No. 63-1.) The NEOC found no reasonable cause to support Plaintiff's allegations.  (Filing No. 63-2.) Plaintiff subsequently filed this suit.  (Filing No. 1-1.)

### STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.  *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*

However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson,* 643 F.3d at 1042 (quotation omitted).

**DISCUSSION**

Plaintiff contends her position change from BHA to BHHA was a demotion prompted by her race, national origin, and color, and due to protected activities in which she engaged. Plaintiff alleges she was retaliated against, subjected to a hostile work environment, and constructively discharged after she engaged in protected speech on three separate matters. First, Plaintiff claims to have repeatedly told Dr. Deol that Deputy Director Smith was improperly making clinical decisions about inmate medical care and treatment. (Filing No. 29.) Second, Plaintiff reported that LCC staff were improperly distributing medication to inmates. (Filing No. 29; Filing No. 25-5.) Third, in May, 2019, Plaintiff reported to Director Frakes that she was being discriminated against by Dr. Deol and suffering from retaliatory treatment by Dr. Deol and Deputy Director Smith. (Filing No. 74-2.)

**1. Evidentiary Objections**

As a preliminary matter, the Court will consider Plaintiff's objections to Defendant's Exhibit Nos. 3, 5, and 8, as well as certain document referenced in these Exhibits. Exhibit 8 is Dr. Deol's affidavit. (Filing No. 63-8.) Plaintiff complains that the affidavit is incomplete because it does not include the exhibits referenced in the affidavit, including a document identified as exhibit 9, which is Dr. Aufderheide's report. Thus, Plaintiff argues Exhibit 8 should be excluded because it is incomplete, lacks foundation, and replete with hearsay. Exhibit 3 is Defendant's response to Plaintiff's NEOC filing. (Filing No. 63-3.) Plaintiff likewise contends Exhibit 3 lacks foundation, contains hearsay, and should be disregarded. Exhibit 5 is the affidavit of Betty Joe Williams, which includes an unsigned attachment identified as exhibit 8. (Filing No. 63-5.) Exhibit 5 purports to outline efforts made by employees to obtain documents requested of Plaintiff regarding the ACLU

litigation. (Filing No. 63-5.) Plaintiff argues Exhibit 5 should be excluded from consideration because it lacks foundation, contains hearsay, and the attached exhibit 8 is unsigned.

Federal Rule of Civil Procedure 56(c)(2), which applies to summary judgment motions, provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). However, the standard at the summary judgment stage is not whether the evidence offered *would* be admissible at trial, "it is whether it *could* be presented at trial in an admissible form." *See* Fed. R. Civ. P. 56(c)(2); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012).

Plaintiff's objections are essentially based on the evidence's form as currently presented. Plaintiff has not argued that Defendant would be unable to present the evidence in a form that would be admissible at trial. *See Gannon*, 684 F.3d at 793 (holding that the district court did not abuse its discretion in overruling a hearsay objection, stating that the plaintiff did not even "attempt to argue that the [evidence] could not have been presented in an admissible form at trial"). Exhibit 3—Defendant's response to Plaintiff's NEOC filing—consists primarily of a declaration from Dr. Aufderheide. Dr. Aufderheide could certainly be called as a witness to testify regarding the content of his declaration. Similarly, the evidence in Exhibit 5—Ms. Williams' affidavit and its attachment—could also be presented through testimony at trial or other means. As for Exhibit 8, the attachments referenced in Dr. Deol's affidavit are already in the record. (Filing No. 63-5; Filing No. 63-3; Filing No. 25-9; Filing No. 25-8). Because the evidence contained in the Exhibits could be presented in an admissible form at trial, Plaintiff's objections are overruled.

### 2. Racial Discrimination

Title VII makes it unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. §2000e-2. The NFEPA is patterned after Title VII and likewise prohibits racial discrimination in the workplace. *Ludlow v. BNSF Ry. Co.*, No. 4:12CV3113, 2013 WL 3872930, at *17 (D. Neb. July 24, 2013). Due to their similarly, courts often address Title VII and NFEPA claims together. *Leiting v. Goodyear Tire & Rubber Co.*, 117 F. Supp. 2d 950, 955 (D. Neb. 2000); *see also Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005)

("Both the Nebraska Supreme Court and [the Eighth Circuit] have stated the NFEPA is patterned after Title VII, and, therefore, it is appropriate to consider federal court decisions construing the federal legislation when considering questions under the NFEPA."). The Court will do so here.

A plaintiff may establish a violation of Title VII's prohibition against race-based discrimination through either direct or indirect evidence. *Twymon v. Wells Fargo & Co*, 462 F.3d 925, 933 (8th Cir. 2006). "Direct evidence of discrimination requires a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (quotation omitted).

Where, as is the case here, there is no direct evidence of discrimination, the court applies the burden-shifting framework set out in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 656 (8th Cir. 2003). If a prima facie case is established, a burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005). "If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." *Twymon*, 462 F.3d at 935.

To establish a prima facie case of discrimination, Plaintiff must show "(1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). Here, the Court will assume without deciding that Plaintiff can make out her prima facie case because, for the reasons set out below, her claim fails at a subsequent step of the *McDonnell Douglas* framework. *See Banford v. Bd. of Regents of Univ. of Minnesota*, 43 F.4th 896, 900 (8th Cir. 2022) ("Even assuming that [the employee] could establish a prima facie case of discrimination, she has not met her burden of showing that [the employer's] legitimate, nondiscriminatory justification for nonrenewal is pretextual").

At the second step of the *McDonnell Douglas* analysis, Defendant must articulate a legitimate non-discriminatory reason for its employment action. "The employer's burden of providing a legitimate, nondiscriminatory reason for an adverse employment action is not onerous." *Henry v. Hobbs*, 824 F.3d 735, 739 (8th Cir. 2016) (citing *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012)). Here, Defendant has offered evidence that it decided to restructure its behavioral health services to provide comprehensive care to inmates. Dr. Deol testified he began to consider a broad-scale restructure in 2017. In 2018, NDCS was sued based on alleged deficiencies in its behavioral health services, and an expert witness retained in the litigation opined that structural re-organization of the behavioral health delivery system would be beneficial. Then, in the spring of 2019, Dr. Deol began to consider moving Plaintiff to the BHAA position as part of a restructure. Although Dr. Deol may not have been aware of the expert witness's testimony regarding the need for reorganization at the time Plaintiff was reassigned, the expert's opinion supports the conclusion that Dr. Deol had a valid concern regarding the need for a restructure. Defendant's evidence establishes a legitimate, non-discriminatory reason for Plaintiff's reassignment.

Because Defendant has articulated a legitimate, non-discriminatory justification for its decision to change Plaintiff's position, Plaintiff must now demonstrate that the stated non-discriminatory rationale is a pretext for discrimination. "A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Bone*, 686 F.3d at 955 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). A plaintiff may demonstrate pretext by "showing that an employer (1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

Plaintiff first attempts to show pretext by arguing there were inconsistencies/shifting explanations about Defendant's decision to restructure and move Plaintiff to the BHAA position. Plaintiff points to alleged (1) contradictory testimony about the timeline of Defendant's decision to restructure; (2) contradictory evidence from Dr. Deol and Dr. Frakes about who ultimately made the decision to move Plaintiff to the BHAA position; and (3) shifting reasons for why Plaintiff was moved to the BHAA position—whether the decision was performance based or the result of heavy

demands of the BHA position.  The problem with Plaintiff's argument, however, is that viewed in its full context, all this evidence is in step.

Defendant has not deviated from its position that behavioral health services needed to be reorganized.  Multiple individuals saw the need for a restructure, including the expert witness retained for the ACLU lawsuit.  The evidence regarding the timeline for the reorganization is not contradictory, as Plaintiff asserts.  There was testimony indicating reorganization began in 2017 and 2019, but as Dr. Deol explained, the reorganization started as a system-wide, ongoing process not exclusively limited to behavioral health services.  Dr. Deol testified that he started the process of reorganization in the "broader sense" in 2017 and that the piece of reorganization that developed in 2019 was the behavior health/mental health side.  As to who made the decision to reorganize and reassign Plaintiff—Dr. Deol or Director Frakes—it is completely consistent that they each were decisionmakers and part of the process.  Dr. Deol reported to Director Frakes.

Plaintiff also believes Defendant provided contradictory explanations for Plaintiff's reassignment, which supports pretext. However, Defendant's assertion regarding why Plaintiff was moved to the BHAA position as part of the restructure has been consistent. Plaintiff points to Dr. Deol's testimony indicating Plaintiff's reassignment was performance based, and Director Frakes' testimony stating reassignment was necessary based on the demands of the BHA position. This testimony is not contradictory—the differences are simply a matter of viewpoint. It is not unreasonable for Dr. Deol to believe that Plaintiff's alleged unsatisfactory work was attributable to her work ethic, while Director Frakes believes the performance deficiencies were caused by the demands of the position. Plaintiff herself indicated some of her duties were onerous. Plaintiff testified that gathering the documents requested by Dr. Aufderheide for the ACLU suit was a time consuming and difficult process based on systems available.

Regardless of the characterization of Plaintiff's work performance and the reasons why she performed the way she did, Defendant's argument throughout this litigation has been that Plaintiff's perceived struggle to fully meet the demands of the BHA position (for whatever reason) was just one factor in its decision to restructure behavioral health and reassign her.  Dr. Deol stated in his affidavit that "[t]he retirement of Dr. Thomas and *the totality of the circumstances* regarding [Plaintiff] lead to my decision to restructure." (Filing No. 63-8.)  Consistent with his affidavit, Dr. Deol testified in his deposition:

What the reorganization was trying to, in my mind, was trying to get the clinicians to see patients, because that's where the strengths are, and how do I support the clinicians for operational issues.

And that's what my focus was, and how do I support clinicians to deal with the, with the things that they do need, and those are the things that we had talked about.

***

Okay. I mean, it's not – it's you're asking multiple portions of this question, and the reorganization was not specifically related to the performance issues; it was related to how do we provide better care to inmates and clinicians doing clinician duties.

(Filing No. 63-12.)    Similarly, when Dr. Frakes was asked if Plaintiff's reassignment was performance related, he testified:

Well, not in the sense of saying here's your duties and you should be able to accomplish these and why aren't you getting them done?

It was conversation around this position has a huge range of duties; we had a person in it who left in 2015, and there was some -- obviously, they were having some challenges.

Another person came into that position for a year, approximately; they had definitely had challenges in trying to make everything work, as well as their own personal challenges that led to their resignation.

And then again, seeing [Plaintiff] struggle to keep all the pieces moving, it was a, just a very large, a large area of responsibility and a large area of ground to cover with 10 facilities.

And the conversations that I had with Dr. Deol were around, you know, is this reasonable? Is this a good organizational structure? Is it really reasonable that one person can cover all of these moving pieces and do that effectively?

So not that her performance was poor but that the expectations given to the position were, you know, unreasonable.

(Filing No. 63-14.)  The evidence surrounding the reasons why Plaintiff was reassigned does not support a finding of pretext.

As to any perceived deficiencies regarding her job performance, Plaintiff argues Defendant failed to follow its policy of progressive discipline when it transferred her to her new position. However, even if Plaintiff could show she was reassigned for purely performance-based issues, Plaintiff has not presented any examples of Defendant giving discretionary employees such as

herself progressive discipline. In short, there is no evidence that Defendant was obligated by policy to use progressive discipline for Plaintiff or other discretionary employees.[2]

Plaintiff also cannot show that Defendant treated similarly situated employees differently to support pretext for discrimination. At the time of her reassignment, Plaintiff was the only BHA. This explains why she was the only individual reassigned to a BHAA position. Although her salary was cut by $5,000 when she was moved to the BHAA role, her workload was also lessened. And even after her position change, she made significantly more money than the other BHAAs.

Plaintiff's complaints about her treatment in the workplace fare no better to support pretext. Plaintiff claims she was undermined as BHA by being excluded from meetings and disrespected by Dr. Deol and Deputy Director Smith. She contends she was circumvented in matters involving her department and excluded from trainings or decisions regarding who would attend the trainings. The problem, however, is that even assuming she was treated harshly at work, she has pointed to no actual evidence that this perceived poor treatment was attributable to her race or ethnicity.

To support her conclusion that this differential treatment was race-based, she points to testimony from clinical psychologist, Dr. Mark Lukin, who Plaintiff supervised when she was BHAA. (Filing No. 74-9.) Dr. Lukin testified Plaintiff was mistreated due to her national origin and race. (Filing No. 74-9.) But Dr. Lukin's testimony is admittedly speculative. When Dr. Lukin was asked why he believes Plaintiff was discriminated against based on her race, he stated "I, I don't know that I have – I mean, I don't – I, I – all I have is my personal conjecture." (Filing No. 74-9.) Plaintiff offers nothing but speculation for the conclusion that her alleged treatment was based on her race or ethnicity. Plaintiff admittedly was not subjected to racially or ethnically disparaging comments by Dr. Deol, who himself is African Indian, nor was she subjected to such remarks by other employee. Further, there is evidence that there were other people who did not agree with Dr. Deol's overall management approach, which, according to one employee, could be "off-putting." While Plaintiff may have found Dr. Deol's management style inappropriate, it is complete conjecture to attribute his behavior to discrimination.

---

[2] Discretionary non-classified employees, such as Plaintiff, serve at-will at the pleasure of the agency director and are not subject to the Personnel Rules and Regulations. (Filing No. 63-9; Filing No. 75.)

Because Plaintiff cannot show Defendant's legitimate, non-discriminatory reason for her reassignment was pretextual, her Title VII and NFEPA discrimination claims will be dismissed.

### 3.  Retaliation Claims

Given the reporting activities in which Plaintiff claims to have engaged, her retaliation allegations must be considered as two distinct claims: (1) retaliation under Title VII and the NFEPA for Plaintiff's report of discrimination; and (2) a whistleblower retaliation claim under the NFEPA for Plaintiff's opposition to Deputy Director Smith's alleged involvement in treatment decisions and Plaintiff's report of inmates not receiving medication.  Title VII and the NFEPA each protect against retaliation for opposing or reporting discrimination based on race, color, and national origin.  However, the NFEPA offers broader protections for employees who oppose unlawful employment practices.  Therefore, Plaintiff's Title VII and NEFTA retaliation claims based on Plaintiff's report of discrimination will be considered together. The Court will address Plaintiff's NFEPA whistleblower allegations separately.

### A.  Title VII and NFEPA Claims Based on Report of Discrimination

Title VII's antiretaliation provision forbids employer actions that "'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). The NFEPA similarly forbids an employer from taking adverse action against an employee who opposed a practice that is unlawful under federal or Nebraska law.  *See* Neb. Rev. Stat. § 48-1114. "Retaliation claims under the NFEPA are governed by the same standard as claims for retaliation under Title VII." *Tremaine v. Goodwill Indus., Inc.,* No. 8:16CV488, 2017 WL 394490, at *2 (D. Neb. Jan. 27, 2017).

Here, no direct evidence of discriminatory retaliation is asserted. Therefore, the *McDonnell Douglas* framework applies. *See Hutton v. Maynard,* 812 F.3d 679, 683 (8th Cir. 2016). First, Plaintiff has the initial burden of establishing a prima facie case of retaliation.  *Brannum v. Missouri Dept. of Corrections,* 518 F.3d 542, 547 (8th Cir. 2008).  To do so, Plaintiff must demonstrate (1) she engaged in statutorily protected activity, (2) suffered an adverse employment

action, and (3) the engagement in the protected activity was the but-for cause of the adverse employment action. _Warren v. Kemp_, 79 F.4th 967, 973 (8th Cir. 2023). If she can make this showing, the burden shifts to Defendant to proffer a legitimate, nonretaliatory reason for its actions. _Hutton_, 812 F.3d at 683. If Defendant does so, the burden shifts back to Plaintiff to prove the proffered reason is a pretext for retaliation. _Id_.

Like Plaintiff's discrimination claims, the Court assumes for purposes of this Memorandum and Order that Plaintiff can establish a prima facie case of retaliation based on Plaintiff's report that she was being discriminated against. However, as with her discrimination claims, Plaintiff cannot show the non-retaliatory rationale for her position change—restructure of behavioral health services and BHA position—was pretext for discrimination.

### B. NFEPA Whistleblower Retaliation Claim

The NFEPA forbids an employer from discriminating against an employee who opposes an employment practice that is illegal under federal or Nebraska law. Neb. Rev. Stat. § 48-1114. To establish a prima facie case of unlawful retaliation under the NFEPA, an employee must show that he or she participated in a protected activity, that the employer took an adverse employment action against him or her, and that a causal connection existed between the protected activity and the adverse employment action. _McPherson v. City of Scottsbluff_, 303 Neb. 765, 931 N.W.2d 451 (2019). Plaintiff cannot establish a prima facie NFEPA claim.

First, Plaintiff cannot show that she participated in a protected activity. Under Nebraska law, the unlawful practice whose opposition is protected by the NFEPA is that of the employer—not that of fellow employees. _Wolfe v. Becton Dickinson and Co._, 266 Neb. 53, 662 N.W.2d 599 (2003); _Baker-Heser v. State_, 309 Neb. 979, 963 N.W.2d 59 (2021). The NFEPA is "not a general bad acts statute." _Baker-Heser_, at 990, 963 N.W.2d at 68. Plaintiff complained that LCC nursing staff was not properly administering medication. This complaint does not involve an alleged unlawful employment practice on the part of NDCS, but rather a report that LCC staff may have been acting negligently. Plaintiff's opposition to LCC's nursing staff's alleged behavior does not support a NFEPA retaliation claim.

Second, even if Plaintiff could show she engaged in a protected activity, there is no evidence of a causal link between her reports of alleged unlawful activity and her reassignment. Plaintiff admitted that she reported Deputy Director Smith for improper decision-making in the fall of 2018. (Filing No. 63-17.) She also claims Deputy Director Smith excluded her from meetings and that she was subjected to disrespectful behavior starting in the fall of 2018. (Filing No. 63-17.) However, Plaintiff was not reassigned until June, 2019—over a year from the time she claims she first reported Deputy Director Smith and began suffering hostile treatment in the workplace. This temporal gap is "not sufficiently contemporaneous" to support a causal connection. *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 645 (8th Cir. 2009). *See also Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim and that a two-week interval was sufficient, but barely so.") (internal citation omitted).

John Wilson, who served as Chief Operating Officer of the Department of Corrections Health Services, testified that anyone who disagreed with Deputy Director Smith would be "targeted," regardless of that individuals' race or ethnicity. (Filing No. 74-11.) He stated he observed Deputy Director Smith "targeting" Plaintiff because she opposed Deputy Director Smith's involvement in decisions that Deputy Director Smith allegedly should not have been involved in. (Filing No. 74-11.) But Mr. Wilson did not provide any specifics. (Filing No. 74-11.) He only surmised that Plaintiff's reports would have resulted in her being downsized or removed from power. (Filing No. 74-11.) He was not even aware that Plaintiff had been removed from the BHA position. (Filing No. 74-11.) Mr. Wilson's testimony is only conjecture and does not support the conclusion that Plaintiff's reassignment was due to her reports about Deputy Director Smith. Read in its full context, Mr. Wilson's testimony is really about an overall culture of power that permeated the entire workplace, not necessarily attributable to any reporting activities or opposition to unlawful behavior. (Filing No. 74-11.) Plaintiff has offered no evidence that her reports about Deputy Director Smith or LCC staff resulted in her being reassigned. Therefore, Plaintiff's NFEPA whistleblower claim will be dismissed.

### 4. Hostile Work Environment

Plaintiff contends Defendant subjected her to a hostile work environment in violation of Title VII and the NFEPA. (Filing No. 1-1.) To establish a race-based hostile work environment claim, Plaintiff must show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of her employment. *Singletary v. Missouri Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005).

"Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Title VII does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace." *Wilkie v. Dep't of Health and Human Services*, 638 F.3d 944, 953 (8th Cir. 2011) (quotation omitted). "Merely rude or unpleasant conduct is insufficient to support a claim; instead, actionable conduct must be extreme." *Id*. "The conduct must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Howard*, 149 F.3d at 840.

There is no evidence that Plaintiff was subjected to harassment based on her race, national origin, or due to any of the other protected activities in which she allegedly engaged. Even after she was reassigned to a BHAA position, Plaintiff remained the highest compensated BHAA—making thousands more than her peers. Also, while Plaintiff complains she was treated poorly because she was not selected to attend the Governor's Leadership Training, the evidence shows she was approved to attend more training workshops than any other staff member in behavioral services. (Filing No. 63-8.) In 2019, Plaintiff was approved to attend a four-day training in Washington, a five-day training in Colorado, the American Correctional Association conference in Orlando, as well as three on-site training programs. (Filing No. 63-3.) Additionally, although Plaintiff's workstation changed when she was reassigned, this circumstance does not rise to the level of creating an abusive working environment.

Plaintiff also contends her workplace was hostile because she was excluded from meetings which prevented her from doing her job. However, meeting records show Plaintiff attended twenty-nine out of thirty-seven Central Office Multidisciplinary Review Team meetings in the months leading up to her departure. (Filing No. 63-3.) There is no evidence that Plaintiff was excluded from meetings due to her race, color, ethnicity, or reporting activities.

While there is evidence that Dr. Deol was short and perhaps rude towards Plaintiff at times, there is no support for the conclusion that Dr. Deol behaved this way for racially discriminatory reasons or because Plaintiff reported allegedly unlawful activities. The evidence shows Dr. Deol's behavior in this regard was not limited to Plaintiff. Other employees experienced conduct by Dr. Deol that could be characterized as disrespectful. Sarah Fischer, who later filled the restructured BHA position, testified that there were times she was ignored, dismissed, and spoken over. (Filing No. 63-19.) She further testified that there were other people who did not necessarily agree with Dr. Deol's management approach and that his interpersonal skills could be "off-putting." (Filing No. 63-19.) Nathan Schwab, who was a clinical program manager for the Department of Corrections from 2018-2022, was asked in his deposition whether there were things that he witnessed about the way Dr. Deol interacted with Plaintiff that caused him concern. (Filing No. 74-12.) Mr. Schwab responded, "Probably nothing more than how I saw him interact with, with others, including myself." (Filing No. 63-15.) Although Dr. Deol may have had a management style that Plaintiff found inappropriate, there is no evidence that Dr. Deol treated Plaintiff negatively based on her race, color, national origin, or because she complained about alleged illegal conduct. Therefore, summary judgment will be granted in favor of Defendant on this claim.

### 5. Constructive Discharge

Plaintiff claims the purported retaliatory, hostile work environment rendered her working conditions intolerable, thereby forcing her to quit. "Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation." *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995). However, the bar to relief is high. *O'Brien v. Dep't of Ag.*, 532 F.3d 805, 810-11 (8th Cir. 2008). "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007). An employee can

satisfy the second prong if "the employer could have reasonably foreseen that the employee would [quit] as a result of its actions." *Wright v. Rolette County*, 417 F.3d 879, 886 (8th Cir. 2005) (quotation omitted). Plaintiff has failed to make this showing.

Plaintiff claims she was constructively discharged due to her reassignment and mistreatment, but "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Yang v. Robert Halk Int'l, Inc.*, 79 F.4th 949, 965 (8th Cir. 2023) (quotation omitted). Moreover, even if the Court could find that Plaintiff established that the working conditions were sufficiently intolerable, there is no evidence that Defendant intended to force Plaintiff to quit or that Defendant could have reasonably foreseen that Plaintiff would do so. Quite the contrary. The record shows Plaintiff was compensated significantly more than any other BHAA. While Plaintiff's salary was reduced by $5,000 when she was moved to the BHAA position, the initial plan was for her salary to be decreased by $10,000, which was negotiated by the parties. This accommodation shows an intent to maintain an employment relationship with Plaintiff, not force her to quit. The facts do not support a finding that Plaintiff was constructively discharged. Thus, this claim will also be dismissed.

Accordingly,

 **IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (Filing No. 62) is granted.
2. Judgment will be entered by separate document.

Dated this 8th day of August, 2024.

BY THE COURT:

*Susan M Bazis*

Susan M. Bazis
United States District Judge